FILED
2005 Sep-23  AM 10:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **DOUGLAS EMBRY,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | |
| **VS.** | ) | **CV-02-HS-3167-M** |
| | ) | |
| **M.C. PRODUCTS, INC.,** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

## MEMORANDUM OF DECISION

The court has before it the November 10, 2003 motion (doc. # 30) of

defendant M.C. Products, Inc. for summary judgment.  Oral argument was held

September 24, 2004.

## I. Procedural History

Plaintiff Douglas Embry commenced this action on December 27, 2002, by

filing a complaint in this court against M.C. Products, Inc.,[1] asserting a sexual

harassment claim and a constructive discharge claim under Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e et seq., and a state law claim for negligent

and/or wanton and malicious hiring, training, supervision and/or retention.  (See

---

[1] Plaintiff originally sued Millcast, Inc.  (Compl.)  Defendant changed its name and filed
a motion (doc. # 7) to substitute the new name, M.C. Products, Inc., for the old one.  That motion
was granted by order of this court (doc. # 8) on June 17, 2003.

Compl.)  Defendant's November 10, 2003, motion for summary judgment asserts that there is no genuine issue of material fact and that defendant is entitled to judgment as a matter of law.  (See generally Def.'s Mem. Supp. Summ. J.)

On November 10, 2003, defendant also filed evidence[2] (doc. #31) and a memorandum of law (doc. # 48) in support of its motion.  Plaintiff filed a brief (doc. # 35) and evidence[3] in opposition to the motion on November 28, 2003.  Defendant filed a reply brief (doc. # 39) to plaintiff's opposition on December 5, 2003.  The court has considered all of the briefs and the evidence.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

---

[2] Defendants submitted the following evidence: the deposition of Douglas Embry; the last page of plaintiff's application for employment with defendant, signed by plaintiff; defendant's employee handbook with a page on which plaintiff acknowledged, by his signature, receipt of the book; the EEOC Notice of Charge of Discrimination; the EEOC Charge of Discrimination; case action summaries for cases in which plaintiff was charged with various offenses by the Municipality of Lincoln; a handwritten formal complaint from plaintiff to plant manager Randy McCoy; the deposition of Sanford Knight; Sanford Knight's application for employment with defendant, signed by Knight; the deposition of Ken Shelton; Ken Shelton's application for employment with defendant, signed by Shelton; the deposition of Ronald "Randy" McCoy.

[3] Plaintiff submitted the following evidence:  Excerpts from the deposition of Ken Shelton.  In his brief, plaintiff also relies on evidence submitted by defendant.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that the moving party believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp., 477 U.S. at 323.  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial.  Id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Chapman, 229 F.3d at 1023.  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  Chapman, 229 F.3d at 1023; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249.    The method used by the party moving for summary judgment to discharge its initial burden depends on

3

whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2

F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d

1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at

trial, then it can only meet its initial burden on summary judgment by coming

forward with positive evidence demonstrating the absence of a genuine issue of

material fact; i.e. facts that would entitle it to a directed verdict if not controverted

at trial.  Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a

showing, the burden shifts to the non-moving party to produce significant,

probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy

its initial burden on summary judgment in either of two ways.  First, the moving

party may produce affirmative evidence negating a material fact, thus

demonstrating that the non-moving party will be unable to prove its case at trial.

Once the moving party satisfies its burden using this method, the non-moving

party must respond with positive evidence sufficient to resist a motion for directed

verdict at trial.  The second method by which the moving party who does not bear

the burden of proof at trial can satisfy its initial burden on summary judgment is to

affirmatively show the absence of evidence in the record to support a judgment for

the non-moving party on the issue in question.  This method requires more than a

simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. <u>Fitzpatrick</u>, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. <u>Lewis v. Casey</u>, 518 U.S. 343, 358 (1996) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)).

### III. Relevant Facts[4]

Douglas Embry worked for M.C. Products, Inc. ("M.C. Products") from approximately April 14, 2000, until he quit on March 11, 2002.  (Embry Dep. at 28, 73.)  M.C. Products manufactures functional and decorative architectural columns.  Embry worked as a pourer in M.C. Products' cap and base department.

---

[4] If the facts are in dispute, they are stated in the manner most favorable to the non-moving party.  <u>See</u> <u>Fitzpatrick</u>, 2 F.3d at 1115.

5

(Id. at 31-32.)  His responsibilities primarily consisted of pouring mixtures into column molds and removing the hardened columns.  (Id. at 35-36.)  The alleged harasser, Sanford Knight, also worked for M.C. Products in the cap and base department.  (Embry Dep. at 32; Knight Dep. at 9-10.)  Both men were given a copy of M.C. Products' employee handbook, which contained the company's sexual harassment policy, when they began working there.[5]  (Embry Dep. at 31; Knight Dep. at 10-11, 14-16.)

Knight and Embry knew each other because they had been neighbors when Embry was growing up.[6]  (Embry Dep. at 37; Knight Dep. at 40.)  While they were working together at M.C. Products, Knight and Embry occasionally went to lunch together and smoked marijuana on their lunch breaks.  (Embry Dep. at 40, 208-13; Knight Dep. at 37-38.)  However, after the alleged harassment began, they stopped going to lunch together by themselves and only went with a group of other men, never riding in the same car.  (Embry Dep. at 128-33, 270-71.)  Embry also gave Knight a ride to work for about a two-week period while they were both employed

---

[5] Apparently, Knight either cannot read at all or cannot read very well.  (Knight Dep. at 13-18.)  Paula Leverton, M.C. Products' secretary at the time he was hired, read him the employee handbook, including the sexual harassment policy, and he testified he understood it. (Id. at 11-16.)

[6] Knight was already twenty-five years old when the two lived next door to each other. (See Embry Dep. at 9, 37; Knight Dep. at 40.)

at M.C. Products.  (Embry Dep. at 38-40; Knight Dep. at 54.)  The two worked

together for about one year before the alleged harassment began occurring.

(Embry Dep. at 124.)

     While Embry and Knight worked together in the cap and base department,

they were typically stationed about twenty feet away from each other, and they

sometimes had conversations about sex in general and about certain women they

wanted to have sex with in particular.  (Embry Dep. at 34, 233-34.)  Embry

testified that the two "talk[ed] like . . . construction worker[s]" about women and

sex.  (Id. at 234.)  In addition, when they were riding to work together, Knight told

Embry stories about "date-raping his own aunt," being nicknamed "Uncle Nasty

Tongue" because of the way he performed oral sex on his nieces and nephews, and

"screwing around with men."  (Id. at 54-55, 106-08.)  During these conversations,

Knight also opined that "an asshole is just like a pussy."  (Id. at 55.)

     In August or September 2001, Embry reported to his supervisor, Ken

Shelton, that Knight was "licking his lips and staring" at him.  (Id. at 50-51.)

Embry requested that Shelton ask Knight to leave him alone, but Shelton ignored

Embry.  (Id. at 50-52.)   Because Shelton took no action, Embry reported Knight's

behavior to Randy McCoy, M.C. Products' plant manager.  (Id. at 52.)  Embry also

submitted a handwritten note to McCoy, complaining about Knight's and Shelton's

behavior.  (Id. at 178-85.)  Embry did not allege sexual harassment in his initial

verbal complaints or in the note he wrote McCoy because he was unsure whether

Knight's behavior was sexual in nature and he was "halfway embarrassed that a

man would do that to [him]."  (Id. at 179-80.)  In September 2001, in response to

Embry's complaints, McCoy questioned Knight and the other employees who

worked with Knight and Embry in the cap and base department, but Knight denied

the behavior and no one else saw him do it.  (McCoy Dep. at 44-50.)  Although he

did not report it to either of his supervisors, Embry also testified that Knight would

walk up behind him and stand too close to him while he was bending down to

remove columns from molds and that Knight stared at his crotch.  (Embry Dep. at

46-47, 139-42.)

Because of reports that Knight and Embry were not getting along[7] and

because of a decrease in production demand at the plant, McCoy moved Embry

from the cap and base department to the column line in late August or early

September 2001.  (McCoy Dep. at 51-52; Embry Dep. at 58.)  During the period

he was working on the line, from August or September 2001 until February 2002,

Embry was sent back to the cap and base department about one or two times per

---

[7] McCoy testified that he did not move Embry as a result of the sexual harassment claims.  (McCoy Dep. at 51-52.)

8

week, and many of the times he went back, Knight continued to harass him.

(Embry Dep. at 62-63.)  Embry estimates that Knight harassed him on ten to

twenty occasions when he returned to the cap and base department during this

period.  (Id.)  Nevertheless, after being promised a 75-cent raise, Embry agreed to

move back to the cap and base department full time in February 2002.  (Id. at 66-

67.)  Once Embry was back in the cap and base department, Knight resumed his

previous behavior, licking his lips, blowing kisses and staring at Embry three to

four times a day for three to five minutes at a time.  (Id. at 121-23.)  Knight and

Embry were approximately three to five feet from each other while Knight was

engaging in this behavior.  (Id. at 72-73.)

In March 2002, sometime during the week before plaintiff quit his job at

M.C. Products, Knight told Embry on several occasions that he "wanted to screw

[him] up [his] ass."  (Id. at 73-74, 79-80, 139.)  Embry testified that he really

thought Knight was going to do this or attempt to do this because of a

conversation he previously had with Knight's cousin, known to Embry only as

"Peanut," and because Embry feels that "39 years old is old enough to know when

somebody is trying to do something sexually towards you."  (Id. at 74-76, 176-77.)

"Peanut," who worked with Embry at M.C. Products at some point, told Embry

that Knight had "fucked his own son up his own ass" and that Knight's ex-wife had

shot him in the buttocks for raping their son.  (Id. at 74-77.)  In addition, Knight

did not make similar comments or gestures to his female co-workers.  (McCoy

Dep. at 97-98; Knight Dep. at 62-63; Shelton Dep. at 48.)  The day before he quit,

Embry reported to McCoy that Knight had made comments about sodomizing him.

McCoy laughed and told Embry to ignore Knight.[8]  (Embry Dep. at 79, 143.)

McCoy also threatened to fire both Embry and Knight if they could not get along.

(Id. at 149.)  Despite this, the day before Embry left, McCoy promised to move

him away from Knight but did not do so.  (Id. at 79, 149-50.)

On the day that he quit, March 11, 2002, Embry told McCoy that he "just

couldn't work around no faggot.  I just got to I can't stand it.  I can't take it no

more."  (Id. at 84.)  The same day, McCoy called a meeting in the break room to

discuss the issue.  (Id. at 155.)  Embry, Knight, McCoy, and Shelton attended the

meeting.  (Id.)  At the meeting, McCoy informed Embry that he would not move

him and that he should ignore Knight.  (Id.)  McCoy told Knight to "go back to

work and don't [] worry about it."  (Id.)  Embry then told the group that he didn't

"want to work with no faggots."  (Id.)  Then, Embry testified, Knight told him in

---

[8] It is unclear whether Embry actually told McCoy exactly what Knight said.  He testified
that he "told" McCoy about the incident, but when he was specifically asked what he told
McCoy, he stated that he told him he just "couldn't take" working around Knight anymore, which
falls short of putting McCoy on notice of the situation.  (Embry Dep. at 80, 143.)  However,
because the facts must be construed in the light most favorable to plaintiff, the court will assume
that Embry specifically apprised McCoy of the situation.

front of Shelton and McCoy that, "I will fuck you.  I will fuck you up your ass just like I fucked your wife."  (Id. at 156.)  At that point, Embry clocked out and quit. (Id.)  Both Shelton and McCoy attempted to make Embry reconsider and stay on the job.  (McCoy Dep. at 113.)  After being provoked by Knight's comment about his wife, on his way out the door, Embry told Knight that "[h]e might have had sex with my wife, but he probably ain't had more sex than I've had with his wife."[9] (Embry Dep. at 272.)

## IV. Applicable Substantive Law and Analysis

Plaintiff's complaint alleges a sexual harassment claim and a constructive discharge claim under Title VII and a negligent hiring, training, supervision, and/or retention claim under state law.  Defendant's motion for summary judgment, as amplified in its memorandum in support thereof, asserts that (1) plaintiff's sexual harassment claim fails because he cannot show the alleged harassment occurred because of his gender or that he was subjected to conditions that constitute a hostile work environment as a matter of law, (2) plaintiff's constructive discharge claim fails because his work conditions were not intolerable and he failed to act reasonably under the circumstances, and (3)

---

[9]  Apparently, one of Knight's wives, LuAnn "Belle" Story, had a sexual relationship with Embry while the two were in high school together.  (Embry Dep. at 157-58, 271-72.)

plaintiff's negligent and/or wanton and malicious hiring, training, supervision and/or retention claim fails because he cannot prove the underlying tort and because defendant had no notice or knowledge of Knight's alleged misconduct before it occurred.  (See generally Def.'s Mem. Supp. Summ. J.)  Each of plaintiff's claims is discussed separately below.

## A. Sexual Harassment Claim

Title VII of the Civil Rights Act of 1964 provides that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  While the language of Title VII does not explicitly mention sexual harassment, the Supreme Court and the Eleventh Circuit have long recognized that the congressional intent behind prohibiting discrimination in "terms, conditions, or privileges of employment" includes prohibiting "the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment."  Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993); Mendoza v. Borden, Inc., 195 F.3d 1238, 1244-45 (11th Cir. 1999); Henson v. City of Dundee, 682 F.2d 897, 901 (11th Cir. 1982).  Sexual harassment does not

need to involve members of the opposite sex; same-sex harassment is also actionable under Title VII. <u>Oncale v. Sundowner Offshore Serv., Inc.</u>, 523 U.S. 75, 79-80 (1998). Although courts have clearly held that Title VII prohibits sexual harassment, they have also emphasized that "Title VII is not a federal 'civility code'" that prohibits all kinds of teasing and rude behavior that occur in the workplace. <u>Mendoza</u>, 195 F.3d at 1245 (quoting <u>Oncale</u>, 523 U.S. at 82).

To establish a prima facie case for a sexually hostile work environment claim, plaintiff must show (1) that he belongs to a protected group, (2) that he has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and/or other conduct of a sexual nature, (3) that the harassment was based on his gender, (4) that the harassment "was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment," and (5) that a basis for holding the employer liable exists. <u>Hulsey v. Pride Restaurants, L.L.C.</u>, 367 F.3d 1238, 1244 (11th Cir. 2004); <u>Mendoza</u>, 195 F.3d at 1245.

Defendant does not dispute that plaintiff has established elements (1), (2), and (5) of his prima facie case. Both genders are protected equally under Title VII. Thus, as a man, plaintiff is a member of a protected group. With regard to the second element of the prima facie case, if the facts are construed in the light

13

most favorable to plaintiff, it is clear that Embry was subjected to unwanted sexual harassment because of Knight's comments and behavior.  Whether Knight's conduct was severe or pervasive enough to alter Embry's terms and conditions of employment is a separate inquiry, which is discussed below.

The fifth element of the prima facie case has also been established in this case.  In Title VII cases where the alleged harassment was committed by a co-worker, a plaintiff must show that his employer had either actual or constructive notice of the harassment and "failed to take immediate and appropriate corrective action."  Watson v. Blue Circle, Inc., 324 F.3d 1252, 1259 (11th Cir. 2003). Actual notice can be shown by proof that defendant's management knew about the harassment.  Id.  Actual notice is automatically established if the employer has a clear, published sexual harassment policy, and plaintiff follows the complaint procedure outlined in the policy.  Id.  In the instant case, M.C. Products had actual notice of the harassment.  Plaintiff reported Knight's behavior to both his immediate supervisor, Ken Shelton, and the plant manager, Randy McCoy, in either August or September of 2001 and reported Knight's subsequent harassment to McCoy up until the time plaintiff quit his job on March 11, 2002.  Plaintiff's reporting was in accordance with the clear, published sexual harassment policy

14

followed by M.C. Products,[10] which states that "[e]mployee complaints of sexual harassment may be made either through the company's regular complaint procedure[11] or directly to the plant manager."  Plaintiff followed this procedure by reporting to Shelton, who reported to McCoy, and by reporting directly to McCoy. Because M.C. Products had actual notice of the harassment, plaintiff has clearly established the fifth element of his prima facie case.

Defendant disputes the existence of the third element of plaintiff's prima facie case:  that the harassment was based on his gender.  In order for a Title VII plaintiff to establish this element, he must show that "but for the fact of [his] sex, [he] would not have been the object of harassment."  Henson, 682 F.2d at 904.  In other words, in a typical case where a male supervisor harasses a female worker, if the worker shows that the male supervisor did not treat her male co-workers in a similar manner, she has established that the harassment was based on her sex.  Id. However, in cases in which the alleged harasser treats workers of both sexes

---

[10] The sexual harassment policy is part of the MillCast, Inc. Employee Handbook, which was submitted to the court as defendant's exhibit 2.

[11] The term "regular complaint procedure" is not defined in the sexual harassment policy. Shelton was not aware of the term but knew that sexual harassment complaints were supposed to be reported to an employee's supervisor and then investigated.  (Shelton Dep. at 70-71.)  McCoy testified that the "regular complaint procedure" consisted of the employee reporting it to his immediate supervisor, who would in turn report it to the plant manager, who would continue reporting up the chain if he felt the claim warranted further investigation.  (McCoy Dep. at 77-78.)

similarly or the conduct is equally offensive to both sexes, a plaintiff cannot show that the harassment was based upon sex because men and women were afforded equal treatment.  Id.

In the instant case, plaintiff has established that the harassment was based on his gender.  Defendant relies heavily on a Seventh Circuit case which suggests that if the alleged harasser did not actually wish to participate in some sort of sexual act with the plaintiff but instead made comments that were "expressions of animosity or juvenile provocation,"[12] then the harassment could not be based on the plaintiff's sex.  Johnson v. Hondo, Inc., 125 F.3d 408, 412 (7th Cir. 1997).  The Johnson case, however, predates the Supreme Court's decision in Oncale, in which the Court clearly states that "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex."  Oncale, 523 U.S. at 80.  A sexual discrimination claim can lie even if the "harasser is motivated by general hostility" or animosity toward the plaintiff and not by a desire to have

_____

[12] The Seventh Circuit held that
[E]xpressions such as "fuck me," "kiss my ass," and "suck my dick," are commonplace in certain circles, and more often than not, when these expressions are used (particularly when uttered by men speaking to other men), their use has no connection whatsoever with the sexual acts to which they make reference - even when they are accompanied, as they sometimes were here, with a crotch-grabbing gesture.  Ordinarily, they are simply expressions of animosity or juvenile provocation, and there is no basis in this record to conclude that [the alleged harasser]'s usage was any different.
Johnson, 125 F.3d at 412.

sex with him or her.  Id.  Thus, it is not necessary, as defendant appears to believe, to prove that the alleged harasser is a homosexual.  In this case, Embry has shown that the harassment was based on his gender because Knight did not similarly harass his female co-workers by licking his lips at them, blowing them kisses, or making inappropriate sexual comments.  (McCoy Dep. at 97-98; Knight Dep. at 62-63; Shelton Dep. at 48.)  Thus, regardless of whether Knight actually desired to have sex with Embry, Knight's harassing comments and gestures were only aimed at Embry, a man.  They were not aimed at his female coworkers or at all of his other coworkers generally.  Because of this, Embry has established the third element of his prima facie case.

Defendant also disputes the existence of the fourth element of the prima facie case:  that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.  This element of the prima facie case contains both subjective and objective components.  Mendoza, 195 F.3d at 1246.  The plaintiff must subjectively view the harassment as severe or pervasive enough to alter the terms and conditions of employment, and the plaintiff's perception must be objectively reasonable under the circumstances.  Id.  The objective component of this test is fact-intensive, and there are four factors that courts should consider in determining

whether harassment objectively altered the terms or conditions of employment:

"(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the

conduct is physically threatening or humiliating, or a mere offensive utterance;

and (4) whether the conduct unreasonably interferes with the employee's job

performance." Id.  These factors should be used to consider all instances of

harassment collectively with regard to the totality of the circumstances.  Id.

In the instant case, considering the aforementioned factors under the totality

of the circumstances, Embry has not demonstrated that the harassment was

sufficiently severe or pervasive to alter the terms and conditions of employment

and create a discriminatorily abusive working environment.  The court does not

doubt that Embry subjectively perceived the harassment to be severe and pervasive

enough to alter the terms and conditions of his employment.  However, the

harassment is not objectively severe or pervasive enough.  The factors used in

determining this are discussed below.

In determining whether the terms and conditions of his employment were

objectively altered, the court first looks at the frequency of Knight's conduct.

While Knight only told Embry he wanted to "fuck him up the ass" on a couple of

occasions, he frequently licked his lips at Embry, blew him kisses, and stared at

him.  Embry estimated that it happened as many as twenty times during the six-

month period he was returning to the cap and base department from the line and three or four times per day once he returned to caps and bases full time.

Second, the court examines the severity of Knight's conduct.  While Knight's gestures - licking his lips, blowing kisses, and staring at Embry - could certainly be construed as suggestive and his comment about "fucking [plaintiff] up the ass" was definitely vulgar, they do not rise to the level of being severe enough to alter the terms or conditions of plaintiff's employment when compared to the facts of other Title VII cases.  See, e.g., Gupta v. Florida Bd. of Regents, 212 F.3d 571, 584-85 (supervisor telling employee that she was beautiful on one occasion, frequently calling her at home, and commenting on the promiscuity of people from Jamaica compared to the innocence of people from India was not sufficient to alter the terms or conditions of employment); Mendoza, 195 F.3d at 1247-48 (supervisor rubbing his hip against employee's hip, making sniffing noises while looking at her groin, and constantly following her and staring were insufficient to alter terms and conditions of employment); cf. Griffin v. City of Opa-Locka, 261 F.3d 1295, 1312-13 (11th Cir. 2001) (supervisor requesting employee work for him because she had "big tits;" repeatedly asking employee out on dates, to cook for him, and to be his girlfriend; making sexual comments and insulting remarks about her body, weight, and appearance; constantly requesting hugs so he could

feel her breasts and look down her shirt; rubbing his knee against her buttocks and whispering that he was still looking for a girlfriend; and finally raping her after she refused his advances sufficient to create jury question on whether terms and conditions of employment were altered); Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 509 (11th Cir. 2000) (alleged harasser giving coworker unwanted massages, standing so close to her that his body parts touched her from behind, and pulling his pants tight to reveal the imprint of his body parts severe enough to go to a jury).  In his deposition testimony, the main behavior Embry reported was that Knight was staring at him, but the Eleventh Circuit has recognized that, while staring at someone, combined with other behavior, can rise to the level of being severe and pervasive, in general, "the everyday observation of fellow employees in the workplace is also a natural and unavoidable occurrence when people work together in close quarters."  Mendoza, 195 F.3d at 1248.  While some of Knight's other behavior - licking his lips and blowing kisses - may not be unavoidable consequences of working in close quarters, the conduct plaintiff complains of in this case - staring and gesturing without touching or threatening - is much more analogous to the conduct in Gupta and Mendoza than it is to the conduct in Griffin and Johnson, and it simply does not rise to the level of being severe or pervasive enough to create a jury question.

Third, the court looks at whether Knight's conduct was physically threatening or humiliating or instead was a mere offensive utterance.  In the instant case, Knight's behavior did not rise to the level of being physically threatening or humiliating.  Knight did not actually touch Embry, and he never threatened Embry with any sort of physical force if Embry did not submit to what Embry characterizes as Knight's sexual advances.  Despite Embry's contention that he felt threatened by Knight because Knight is "a big guy," Embry was apparently not afraid to tell Knight that "he was going to make me [Embry] hurt him."  (Embry Dep. at 82, 54.)  While Knight's behavior and comments were in poor taste and may have been offensive to Embry, they seem to amount to little more than the type of "male-on-male horseplay" Title VII is not designed to protect against, especially in light of Embry and Knight's previously friendly relationship.  See Oncale, 523 U.S. at 81.  Just a short time before the alleged harassment occurred, the two were going to lunch together and smoking marijuana.  They had previously talked about vulgar topics, and Knight may not have known that Embry no longer wanted to participate in such discussions or in any type of friendly banter.  The fact that Embry was offended is irrelevant because a reasonable person in Embry's situation would not construe Knight's behavior to be physically threatening or humiliating or severe enough to alter the terms and conditions of

21

Embry's employment.  Knight's conduct is much more akin to an "offensive utterance."  Even if, however, Embry could demonstrate that Knight's conduct was physically threatening or humiliating, he still cannot establish that it was severe or pervasive enough to alter the terms and conditions of his employment or that it unreasonably interfered with his job performance.

Lastly, the court examines whether Knight's conduct unreasonably interfered with Embry's job performance.  Although Embry claimed Knight's behavior distracted him while he was working, there is no evidence to indicate that it unreasonably interfered with his job performance.  Despite Knight's harassment, Embry continued to be an exemplary M.C. Products' employee.  (Shelton Dep. at 23-25; McCoy Dep. at 51-52.)  He was not moved from the cap and base department because of his job performance.  In fact, McCoy had Embry return to caps and bases after he had been moved to the line because he was so skilled at performing the more detailed tasks in caps and bases.  There is no evidence that the quality or quantity of Embry's work product was affected by Knight's harassment.  Thus, the harassment did not unreasonably interfere with plaintiff's job performance.

Considering these four factors under the totality of the circumstances, plaintiff has failed to establish the fourth element of his prima facie case:  that the

22

harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment. The harassment alleged in this case was simply not severe or pervasive enough to support a claim under Title VII, and plaintiff's previous social interactions with Knight, including their conversations about sex, further lessen the severity of Knight's conduct. Because plaintiff has failed to establish a prima facie case on his hostile work environment claim, there is no genuine issue of material fact and defendant is entitled to judgment as a matter of law regarding this claim.

## B. Constructive Discharge Claim

"[W]hen an employee involuntarily resigns in order to escape intolerable and illegal employment requirements to which he or she is subjected because of race, color, religion, sex, or national origin, the employer has committed a constructive discharge in violation of Title VII." Morgan v. Ford, 6 F.3d 750, 755 (11th Cir. 1993) (internal quotations omitted). To prove a constructive discharge, the plaintiff must go beyond just proving actionable harassment because "'[t]he standard for proving constructive discharge is higher than the standard for proving a hostile work environment.'" Walton v. Johnson & Johnson Serv., Inc., 347 F.3d 1272, 1282 (11th Cir. 2003) (quoting Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1231 (11th Cir. 2001)). For purposes of Title VII, constructive discharge

occurs when an "employer imposes working conditions that are 'so intolerable that a reasonable person in [the employee's] position would have been compelled to resign.'" <u>Fitz v. Pugmire Lincoln-Mercury, Inc.</u>, 348 F.3d 974, 977 (11th Cir. 2003) (quoting <u>Poole v. Country Club of Columbus, Inc.</u>, 129 F.3d 551, 553 (11th Cir. 1997)).  In constructive discharge cases, "[p]art of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast." <u>Garner v. Wal-Mart Stores, Inc.</u>, 807 F.2d 1536, 1539 (11th Cir. 1987).  In addition, the employee must generally give the employer time to remedy the situation before leaving the job. <u>Kilgore v. Thompson & Brock Mgmt.</u>, 93 F.3d 752, 754 (11th Cir. 1996).

        In the instant case, Embry cannot show that he was constructively discharged.  Embry could not establish the fourth element of his prima facie case: that Knight's harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment.  Constructive discharge requires an even higher showing of intolerable conditions than that required to establish a prima facie case for sexual harassment.  Because Embry could not even meet the lower burden of establishing a prima facie case, he clearly cannot meet the higher burden of

showing constructive discharge.[13]  In addition, even if Embry had been able to

show sufficiently intolerable conditions, he did not act reasonably under the

circumstances because he did not give his supervisors time to remedy the

situation.  While Embry had previously reported to his supervisors that Knight was

licking his lips and blowing kisses at him, Knight did not begin making vulgar

comments about "fucking up the ass" until the day before Embry quit. (Embry

Dep. at 79.)  The same day, Embry reported it and was told that he would be

moved.  The next day, when Embry was not immediately reassigned, he decided to

quit despite the fact that McCoy had called a meeting in the break room so that he,

Shelton, Embry, and Knight could discuss the situation and despite McCoy's and

Shelton's pleas for Embry to stay on the job and their assurances that something

could be worked out.  A reasonable person would have given McCoy and/or

Shelton more than one day to remedy the situation by moving Embry away from

---

[13] The court disagrees with plaintiff's contention that the plaintiffs in Morgan and Poole, both cases in which the Eleventh Circuit found there was a material issue of fact on the constructive discharge claim, "faced far less egregious facts" than the plaintiff in the instant case. In both Morgan and Poole, the harassment the plaintiffs suffered significantly interfered with their ability to do their jobs.  Morgan, 6 F.3d at 752-53 (genuine issue of material fact on constructive discharge claim existed when, after employee turned down supervisor's request for a date, he told her that she "had not had a real man until she had him," remained in her work area for hours every day, gave her low evaluations and told others to criticize her work); Poole, 129 F.3d at 552 (plaintiff suing under Age Discrimination in Employment Act created genuine issue of material fact when plaintiff offered evidence that supervisor repeatedly made comments about her age, gradually reduced her responsibilities and had his wife sit at her desk, and eventually moved her to another department, giving her only a chair and not a desk and instructing other employees in department not to speak to her).

Knight or by taking some other action.  Because a reasonable person in Embry's situation would not have felt compelled to resign, Embry's claim for constructive discharge under Title VII fails.  No issue of material fact remains, and defendant is entitled to judgment as a matter of law on the constructive discharge claim.

## C. State Law Claim

"Alabama does not recognize an independent cause of action for sexual harassment."  <u>Machen v. Childersburg Bancorporation, Inc.</u>, 761 So. 2d 981, 983 n.1 (Ala. 1999).  Instead, sexual harassment claims must be brought under tort theories, such as invasion of privacy, assault and battery, and negligent training and supervision.  <u>Id.</u>  To establish a cause of action for negligent training and supervision and hold an employer liable for the intentional torts of an employee, a plaintiff must show one of the following:  (1) that the employee's wrongful acts were committed in the line and scope of his employment; (2) that the acts were committed in furtherance of the business of the employer; or (3) that the employer participated in, authorized, or ratified the wrongful acts.  <u>Id.</u> at 984 (citing <u>Mardis v. Robbins Tire & Rubber Co.</u>, 669 So. 2d 885, 889 (Ala. 1995)).  There is no question that Knight was not acting within the line and scope of his employment when he harassed Embry or that his actions were not committed in furtherance of M.C. Products' business.  Thus, the only question before the court is whether M.C.

Products participated in, authorized, or ratified Knight's conduct.  To prove this, a plaintiff must prove the underlying tortious conduct of the harasser and also (1) that the employer "'had actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee; (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted sexual harassment and/or a continuing tort; and (3) that the employer failed to take 'adequate' steps to remedy the situation.'"  <u>Machen</u>, 761 So. 2d at 985 (quoting <u>Potts v. BE & K Constr. Co.</u>, 604 So. 2d 398, 400 (Ala. 1992)).

In the instant case, plaintiff cannot prove that defendant participated in, authorized, or ratified the harasser's conduct because he cannot prove the harasser's underlying tortious conduct.  The Alabama Supreme Court has explicitly recognized that proving the underlying tortious conduct on the part of the employer's agent is a prerequisite to showing an employer participated in, authorized, or ratified the agent's conduct.  <u>Stevenson v. Precision Standard, Inc.</u>, 762 So. 2d 820, 824-25 (Ala. 1999) (holding that because the jury exonerated the supervisor, the employer "simply cannot be held liable for authorizing or ratifying conduct that, according to the jury, did not occur").  In the instant case, because plaintiff has failed to establish a prima facie case of sexual harassment, plaintiff

has failed to "prove" the underlying tortious conduct that would make M.C.

Products liable on a negligent training or supervision claim.

Even assuming, arguendo, that plaintiff could prove the underlying tortious

conduct on the part of the employee-harasser, he cannot prove all three of the

remaining elements necessary to hold M.C. Products liable for negligent training

or supervision.  Embry could prove that M.C. Products was aware of Knight's

conduct and that it was directed at him because he reported Knight on several

occasions.  However, Embry could not prove that, based upon Embry's reports of

Knight's behavior, McCoy and Shelton knew or should have known that Embry

was being sexually harassed.  Both McCoy and Shelton were aware of Knight and

Embry's previously friendly relationship.  That relationship, combined with

Embry's apparently vague reports of Knight's behavior, did not indicate to McCoy

and Shelton that they should take Embry's allegations of harassment seriously.[14]

_____

[14] Shelton's deposition testimony supports the conclusion that he did not know Knight
was sexually harassing Embry because of Embry's vague reports:
   A.  But overall . . . they got along.  From getting to know them, I came to find out
   that they actually live next door to each other.  I also know that they used to ride
   to work together. . . .
   Q.  Do you know of any problems that Doug reported he had with Mr. Knight?
   A.  I know that once Doug said to me that Mr. Knight was staring at him.  I didn't
   quite understand what that meant.
   . . .
   Now, when he said that, I didn't know what to take of it.  I didn't know what to
   take of it, you know.  . . . we [McCoy and Shelton] all were just a little confused. .
   . . [McCoy] kept asking Doug, what do you mean, what do you mean staring at
   me?  And, you know, Doug would just say that he keeps looking at me and

Despite the fact that it was not clear to them that Knight was sexually harassing

Embry, McCoy still took measures to remedy the situation.  He moved Embry

from the cap and base department once and held a meeting to discuss the issue.

McCoy was not given the opportunity to move Embry a second time or take any

other action because Embry quit when he was not moved the very next day.

    In summary, the court finds that no material issues of fact remain and that

defendant M.C. Products, Inc. is entitled to judgment as a matter of law as to all

claims asserted by plaintiff.  A separate order will be entered.

    DONE this 23rd day of September, 2005.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

---

wouldn't go - wouldn't elaborate on it, just kept saying he keeps looking at me. . . .